IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JOSEPH PARENT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-cv-3926 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| Commissioner of Social Security, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

In this case seeking judicial review of denial of Social Security benefits, Plaintiff Joseph Parent filed a Motion for Summary Judgment [Doc. 11]. Defendant Michael J. Astrue, Commissioner of Social Security, also filed a Motion for Summary Judgment. [Doc 10] and a response to Plaintiff's Motion [Doc 13]. Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court **orders** that that Parent's Motion is **denied** and summary judgment is **granted** for the Commissioner.

### I.   BACKGROUND

Parent is a 53-year old male who is five feet, eleven inches tall and weighs approximately 200 pounds. (Tr. 39) Parent has a GED and completed school up to the eighth grade. (Tr. 40) Parent filed an application for supplemental security income on June 3, 2008, alleging disability beginning January 1, 2008 due to bipolar disorder, breathing problems and back pain. (Tr. 29) That application was denied, both initially

and upon reconsideration. Parent requested a hearing, which occurred on February 23, 2009 before Administrative Law Judge Earl W. Crump (the "ALJ"). (Tr. 29)

### Bipolar Disorder

Parent was apparently committed to mental institutions at several points during his childhood for being "uncontrollable" and "violent outbreaks." (Tr. 405)

As an adult, Parent has a lengthy criminal record dating back to 1977, which includes offenses such as larceny, disorderly conduct and resisting arrest, theft, burglary and indecent exposure. (Tr. 402) Parent was incarcerated and civilly committed on a nearly continuous basis from 1985 until 2008, although the medical records from the Arizona Department of Corrections date to only 1998. Those records include treatment and progress notes from the Arizona Community Protection and Treatment Center, the civil commitment facility in which Parent resided after his designation as a "Sexually Violent Person" under Arizona law in 2000. The original offense to which Parent pled guilty in 1985 was a felony sexual assault involving the use or exhibition of a deadly weapon or dangerous weapon. (Tr. 357) During his period of incarceration from 1985 to 1999, Parent committed over 150 major violations including assault, weapons charges, arson, making threats to staff members and 18 sexual violations. (Tr. 388) Parent also committed approximately 650 rules violations during his incarceration. (Tr. 385)

After applying for benefits, Parent had a consultative psychological examination with Dr. Mark Lehman in July 2008. (Tr. 440) After reviewing medical records and interviewing both Parent and his sister, Dr. Lehman recorded his diagnostic impressions as follows: paraphilia, NOS, according to records; polysubstance dependence, in partial

2

remission; nicotine dependence; bipolar disorder, NOS, partially managed with medication (provisional, pending receipt of records documenting symptoms); antisocial personality disorder; and borderline intellectual functioning. (Tr. 440). He gave Parent a Global Assessment Functioning ("GAF") score of 50, indicating moderate symptoms. (Tr. 440). Lehman further noted that "Mr. Parent's Bipolar Disorder should respond to psychiatric treatment, provided he attends his appointments, becomes completely sober and takes his medication exactly as his psychiatrist prescribes.") (Tr. 440). Lehman noted that Parent reported daily activities such as watching television, playing dominoes and billards and preparing simple meals. (Tr. 436). Lehman noted that Parent performs household chores "'as little as possible' . . . , preferring instead to leave it to his mother, who shops for him and manages his finances." (Tr. 436) When Parent did choose to perform routine chores, Lehman reported that Parent was able to do so without assistance. (Tr. 437)

That same day, Parent was assessed by Tri-County Mental Health and Mental Retardation Services. Records from this assessment reflect that Parent had an estimated GAF of 60 and that "Client is able to maintain while on medication." (Tr. 480) Parent's symptoms of bipolar disorder were noted to be mainly "not present," with the exception of the symptoms of elevated mood, grandiosity, and excitement, which were "mild." (Tr. 484).

In August 2008, Parent's condition was reviewed Dr. John Ferguson, a State agency psychologist, who completed a RFC assessment and psychiatric review. (Tr. 441-458). Dr. Ferguson found that Parent (1) was only mildly limited in his daily living

3

activities; and (2) was moderately limited in his social functioning and ability to maintain concentration, persistence, and pace. Dr. Ferguson also noted that Parent had one or two episodes of decompensation. Dr. Ferguson opined that Parent was able to understand, remember and carry out only simple instructions, make simple decisions, attend and concentrate for extended periods, interact adequately with coworkers and supervisors, and respond to changes in the work setting. (Tr. 455-457).

In September 2008, records from Tri-County Mental Health and Mental Retardation Services noted that Parent displayed no manic symptoms, only "very mild" symptoms of elevated mood, grandiosity and excitement. (Tr. 537). Parent himself reported his symptoms as only a 1 out of 10, that his mood had been "good" and that his thoughts had been organized. (Tr. 533, 534). Records from that visit noted that Parent had a "full" response to medication. (Tr. 533)

In November 2008, Tri-County records again noted that Parent had reported his symptoms as only a 1 out of 10 and only complained of a "lack of energy." (Tr. 526, 527). Parent's symptoms were noted as mild and that he had a "full" response to medication. (Tr. 526). As to his bipolar disorder, none of the symptoms were noted as present, with the exception of "very mild" depressed mood. (Tr. 530).

A similar pattern was noted by Tri-County in February 2009, when Parent's sister confirmed that he was "calm and organized and not as much hyperactive." (Tr. 523). As before, a "full" response to medication and only mild symptoms of anxiety and depressed mood were recorded. (Tr. 521).

After the hearing, Parent was examined by neuropsychologist Dr. Larry Pollock. (Tr. 541). Parent claimed that he was stable on medication, stating that it "helps keep [him] in check" and helped with his mood swings. (Tr. 545). Dr. Pollock diagnosed Parent with bipolar disorder, borderline intellectual functioning, polysubstance abuse in remission, and antisocial personality disorder, and he gave Parent a GAF of 52 (Tr. 550). Dr. Pollock opined that Parent's ability to relate to supervisors, coworkers, and the general public and his ability to deal with work stress was poor. (Tr. 551). Dr. Pollock also found Parent's ability to behave in an emotionally stable manner, to relate predictably in social situations, and demonstrate reliability was also poor. However, Dr. Pollock found that Parent's ability to understand, remember, and carry out even complex instructions was good. (Tr. 552). Dr. Pollock concluded that "[b]ecause of his Antisocial Personality Disorder, he has never been able to get along with other people or behave in a way which would make it possible for him to work in a responsible position." (Tr. 549). Although Dr. Pollock observed Parent as having normal dexterity and a normal gait, Dr. Pollock's opinion relates Parent's earlier complaints of "low back problems" as well as asthma and COPD. (Tr. 549) Accordingly, Dr. Pollock opined that Parent's mental, emotional and reported physical impairments combined to prevent Parent from being able to work "in any position." (Tr. 549).

*Back Pain*

Although Parent complains of severe back pain—both during his hearing and in his past medical records—physical exams do not show any significant abnormalities. A physical examination in Arizona in April 1999 found no physical defects. (Tr. 226)

5

Similarly, an examination in December 2007 showed Parent had a full range of motion in his back and extremities. (Tr. 284)

A lumbar spine x-ray done in July 2008 found no significant abnormality. (Tr. 431) In July 2008, Parent had a consultative physical examination with Dr. Robert Holmes, who diagnosed Parent with low back pain and bipolar disorder in partial remission. Holmes noted a normal spine curvature, and, although he complained of tenderness, Parent had only mild limits to flexion, extension and lateral bending of his lumbar spine. (Tr. 427) Holmes noted that Parent had a "straight leg raise abnormal bilaterally" but that Parent retained a full range of motion and no tenderness in his joints. (Tr. 427). Parent's muscle strength in all extremities was rated a 5 out of 5. Parent's gait was described as "steady and normal" and he was able to rise from a seated position and squat without assistance. Holmes noted Parent appeared to have some difficulty in lifting and carrying, and in bending from a standing position to pick a pen up off the floor. Overall, Holmes concluded, "Findings are consistent with lumbar spine pain. There is no significant disruption of motor function." (Tr. 427)

On August 20, 2008, Dr. John Durfor reviewed Parent's medical records and lumbar x-ray and concluded that the alleged severity and limiting effects Parent's alleged degenerative disc disease was not supported by the evidence. (Tr. 459).

### Breathing Issues

Parent's medical records and hearing testimony reveal him to be a pack-a-day smoker and to occasionally smoke marijuana. (Tr. 53) Parent's records from the Arizona Department of Corrections indicate that Parent reported a history of asthma as early as

6

1999, and that his asthma was being treated with an albueterol inhaler. (Tr. 228). Physical examinations from that time do not reveal any observed problems with his sinuses or lungs. (Tr. 225) Notes from Parent's time at Arizona Treatment Protection and Treatment Center reflect that an x-ray showed signs of early COPD, and that his inhaler helped with symptoms. (Tr. 394, 271). Parent's initial social security applications and hearing testimony, however, fail to complain of his breathing problems as a source of his inability to work. (Tr. 160, 168-70, 53)

### Hearing

On March 3, 2009, ALJ Earl W. Crump held an administrative hearing at which Parent appeared and testified with the assistance of an attorney representative. (Tr. 11, 27-92). Parent's mother and an impartial vocational expert also testified. (Tr. 11, 27-92). At the time of the hearing, Parent lived with his mother and stepfather. (Tr. 16, 39-42). Parent reported that he did not work while in prison, even when offered the opportunity, due to his fear of "going off and getting mad at somebody." (Tr. 42). Parent's testimony reflected a person of sufficient intelligence and mental function to describe his weight as having "fluctuated" and that his appetite was "usually ... like a horse," and he stated that although he had trouble reading a newspaper, he could read and write and do basic arithmetic. (Tr. 40, 41) Further, he stated that he enjoyed watching television and playing dominoes or cards with his mother daily. (Tr. 42). He also stated he played chess. (Tr. 43) He reported that he did "as little as possible" housework although he did maintain his own bathroom and help with dusting. (Tr. 43)

Parent said that his back pain "varies" from day to day: "on the best it's a 4 to 5 on a scale of 1 to 10. And at the worst, an 8 to 9." (Tr. 45) Parent also reported that medication did help with his back pain, and that the last time he sought treatment and was prescribed medication for his back pain and asthma was during his release from prison. (Tr. 45, 48). Parent also reported wearing a back brace, which he said also helped with the back pain. (Tr. 50) Parent estimated that he was able to walk for an hour and estimated he could be on his feet for an hour out of an eight hour workday. (Tr. 51) Parent estimated that he was able to sit for a half hour to an hour at a time, and stated that he avoided bending over because of his back. (Tr. 51, 52) He denied having any trouble gripping items and stated that he could reach overhead with either arm except "when my back bothers me." (Tr. 52) Parent first estimated he could lift or carry ten pounds on a regular basis, but revised that opinion upon examination from his attorney to only "five to ten pounds, varying in there." (Tr. 52, 55)

Although Parent described having memory problems and problems getting along with other people at the hearing, Parent's attorney conceded that Parent's mental condition had improved since his release from custody in Arizona, and that at least one doctor had opined that Parent should respond to further psychiatric treatment. (Tr. 34).

Parent's mother testified regarding Parent's mental problems. She stated that Parent had been "in and out of institutions since he was 9 years old." (Tr. 63) She described Parent as "uptight" and "withdrawn" around other people, even on medication. (Tr. 64) She also stated that he had a potential to be "extremely violent." (Tr. 64) Specifically, she described an incident during Parent's childhood when a duckling bit him

8

and a 4-year old Parent retaliated by biting the duckling's head off. (Tr. 64). She noted that he had never been physically violent with her and that his behavior had improved "a lot" since he had begun taking Abilify. (Tr. 65) She noted, however, that "he can still fly off the handle at any minute, at anything at any time." (Tr. 65). She stated she was afraid of her son. (Tr. 66)

Linda Ferris testified as a vocational expert ("VE"). The ALJ posed a hypothetical regarding the work available to a person of Parent's age, education and vocational background with the following limitations: no exertional limitations, but precluded from performing highly detailed work, with limitations on work requiring sustained persistence and pace for prolonged periods and limited to no more than occasional interaction with the general public or coworkers. (Tr. 74) The VE testified that such a person could work as an automobile porter, food service worker, or groundskeeper and that such jobs existed in the local and national economy. (Tr. 74, 75) The ALJ posed a second hypothetical in which the same criteria were present but limiting the person exterionally to medium work, and the VE responded that the same jobs were available. (Tr. 75) The ALJ then posed a third hypothetical with the same criteria but this time limiting the person to light work, and the VE responded that such a person could work in the local and national economy as a laundry press operator, office cleaner, or photocopy machine operator. (Tr. 75, 76)

### *ALJ's Decision*

On April 21, 2009, the ALJ issued a decision finding Parent was not disabled within the meaning of the Social Security Act. (Tr. 11-22). The decision analyzed

9

Parent's claim under a five-step sequential evaluation process. (Tr. 11-22).[1] At step one, the ALJ determined that Parent had not engaged in substantial gainful activity since his alleged onset date of June 3, 2008. (Tr. 13). At step two, the ALJ determined that Parent had severe impairments of bipolar disorder and degenerative disc disease, but that Parent's alleged asthma and chronic obstructive pulmonary disease were not medically determinable impairments. (Tr. 13-14). At step three, the ALJ determined that Parent's impairments did not meet or medically equal any of the listed impairments required for presumptive disability under the regulations. (Tr. 14; 20 C.F.R. pt. 404, subpt. P, Appx. 1). In making this finding, the ALJ noted that Parent did not meet the critera for listing 1.04 because his degenerative disc disease did not compromise the spinal cord or nerve root. (Tr. 12). The ALJ also noted that Parent's mental impairment did not satisfy the paragraph B or paragraph C criteria. (Tr. 12).

Next, the ALJ evaluated the medical evidence in the record and assessed Parent's residual functional capacity ("RFC"). The ALJ found that Parent had the RFC to perform medium work, except that Parent could perform only simple one to three step tasks in a routine work environment, and he is moderately limited in his ability to maintain sustained concentration, persistence or pace and he should have no more than occasional contact with the general public or with coworkers. (Tr. 15).

---

[1] (1) Is the claimant currently working? (2) Does he have a severe impairment? (3) Does the impairment meet or equal an impairment listed in Appendix 1? (4) Does the impairment prevent him from performing his past relevant work? (5) Does the impairment prevent him from doing any other work? 20 C.F.R. §416.920(a)(4) (2003).

As part of this analysis, the ALJ evaluated the credibility of Parent's subjective complaints and found Parent's statements regarding the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they conflicted with the RFC assessed by the ALJ. (Tr. 16-21). Regarding Parent's back pain, the ALJ noted a history of complaints about back pain in Parent's medical records, but he also noted that Parent had full range of motion in his back and no tenderness when examined in Arizona; and the July 2008 lumbar spine x-ray found no significant abnormality. (Tr. 17; Ex. 1F/3; Ex. 2F/32; Ex. 5F/4). The ALJ further noted that Parent's report that he enjoyed playing billiards was inconsistent with his claim of disabling lower back pain. (Tr. 17; Ex. 6F/5)

Regarding Parent's bipolar disorder, the ALJ noted that the records from Parent's Arizona doctors reflect that Parent's behavior improved in months before a hearing and that this was evidence that Parent has the "ability to control his behavior if he chooses to do so." (Tr. 18). The ALJ further noted (1) the improvement of Parent's symptoms as observed by Tri-County doctors during the fall of 2008 and spring of 2009; (2) his "full" response to his medication; and (3) that his GAF score increased from 45 to 60 during this time. (Tr. 18)

Regarding the opinion evidence, the ALJ noted that no treating doctor had ever opined that Parent is disabled. (Tr. 19). After reviewing Dr. Pollock's records, the ALJ gave very little weight to Dr. Pollock's reports based on the fact that he had only examined Parent one time, and because his opinion is "not consistent with the vast majority of the medical records which indicate [Parent] has only mild symptoms and responds well to medication." (Tr. 19). The ALJ further found that Dr. Pollock's report

11

was internally inconsistent, in that he diagnosed Parent with borderline intellectual functioning, yet was of the opinion that Parent could perform complex tasks. (Tr. 19). Although Dr. Pollock found that Parent had a number of "poor" work related functional abilities, he gave Parent a GAF score of 52, indicating only moderate symptoms. The ALJ noted that this GAF score was inconsistent with Dr. Pollock's conclusions that Parent had a total inability to function in a work setting. (Tr. 19-20). Finally, the ALJ noted that, "Dr. Pollock is a neuropsychologist; therefore an assessment of [Parent's] physical complaints is beyond the scope of his expertise." (Tr. 20).

In contrast, the ALJ found the RFC was supported by the records and opinions of Dr. Lehman and Dr. Ferguson and the records from Parent's treatment in Arizona and his treatment by doctors at MHMRA. (Tr. 20-21). Specifically, the ALJ noted Dr. Lehman's opinion that Parent had a GAF of 50, indicating moderate symptoms and that Parent should respond to psychiatric treatment with full medical compliance. (Tr. 20). The ALJ also noted Dr. Ferguson's opinion that Parent was only mildly limited in his activities of daily living; moderately limited in his social functioning and ability to maintain concentration, persistence and pace; and had only 1 or 2 episodes of decompensation. (Tr. 20). The ALJ concluded that Parent's ability to control his mood swings and aggression was "well managed" by medication, and the RFC limitations were therefore appropriate. (Tr. 21).

At step four in the sequential evaluation process, the ALJ determined that Parent had no past relevant work. (Tr. 21). At step five, the ALJ determined, based on vocational expert testimony, that Parent could perform other work that existed in

significant numbers in the national economy, *i.e.*, automobile porter, food service worker or groundskeeper. (Tr. 21) Accordingly, the ALJ concluded that Parent was not disabled within the meaning of the Social Security Act at any time after his application date. (Tr. 22).

Parent appealed the ALJ's decision to the Social Security Administration's Appeals Council, which denied his request for review on October 6, 2009. (Tr. 1-3). This appeal followed.

## II.	SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing of the existence of an element essential to the party's case, and on which that party will bear the burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Celotex Corp.*, 477 U.S. at 322–23; *Weaver v. CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). "An issue is material if its resolution could affect the outcome of the action. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2006) (internal citations and quotation marks omitted).

## III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision under 42 U.S.C. § 405 (g) is limited to whether the decision is supported by substantial evidence in the record and whether the proper legal standard was used in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120 (1995); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992). Substantial evidence is such evidence that a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The Court must affirm the Commissioner's final decision where substantial evidence supports the Commissioner's decision and the Commissioner followed the relevant legal standards. *See Carey v. Apfel*, 230 F.3d 131, 135 (5th Cir. 2000). Reversal is appropriate only where no credible evidentiary choices support the Commissioner's decision. *See Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988). Indeed, "[t]he court does not reweigh the evidence in the record, try the issues de novo, or substitute its judgment for the Commissioner's, even if the evidence weighs against the Commissioner's decision." *Carey*, 230 F.3d at 135, *citing Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999).

The claimant bears the burden of proving his disability by establishing a physical or mental impairment lasting at least 12 months and preventing him from engaging in any substantial gainful activity. 42 U.S.C. §1382c (2004). In determining whether a claimant

is capable of engaging in any substantial gainful activity, the Commissioner applies a five-step sequential evaluation process. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994); 20 C.F.R. § 416.920(a)(4) (2010). A finding that a claimant is disabled at any point in the five-step process is conclusive and terminates the Commissioner's analysis. *Bowling*, 36 F.3d at 435. The ALJ decided this case at step five by determining that Parent retained the ability to perform work that existed in significant numbers in the national economy. (Tr. 21). Although the burden of production shifts to the Commissioner at step five, the ultimate burden of persuasion remains with the claimant. *See Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005).

## IV. ANALYSIS

### A. ALJ's Incorporation of Functional Limits

Parent asserts that the ALJ's assessment of his mental RFC is in error because it failed to fully incorporate all significant functional limitations provided in the mental RFC assessments done by both Dr. Ferguson and Dr. Pollock. (Plaintiff's Brief at 3) Parent first argues that the ALJ did not fully incorporate the findings of Dr. Ferguson, the State agency medical consultant. (Plaintiff's Brief at 3-4). Parent claims the ALJ failed to include Dr. Ferguson's opinion that Parent is moderately limited in his ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform a consistent pace without an unreasonable number of rest periods. (Plaintiff's Brief at 3). Parent similarly claims the ALJ failed to include Dr. Ferguson's opinion that Parent is limited in his ability to maintain socially appropriate behavior. (Plaintiff's Brief at 3-4). However, the ALJ did accommodate the moderate

limitations found by Dr. Ferguson in his RFC assessment by limiting Parent to only occasional contact with the general public or coworkers. (Tr. 15). Parent fails to show how any additional limitation was required, or why the ALJ's RFC assessment does not adequately encompass such a limitation.

Parent argues that the ALJ failed to consider Dr. Ferguson's "moderate" limitation in Parent's ability to complete a normal workday and workweek without interruption from psychologically based symptoms. (Tr. 456). *See* Plaintiff's Brief at 3. The ALJ asked the vocational expert whether an individual who experienced "moderate limitations in performing work requiring sustained persistence and pace for prolonged periods" could perform work activity, and the vocational expert offered a number of jobs such an individual could perform. (Tr. 75-76). This question takes Dr. Ferguson's opinions into account. Each limitation included in Dr. Ferguson's assessment was presented to the vocational expert, who stated, "my stated jobs are within accommodating these types of restrictions." (Tr. 78-80).

Parent further argues that the ALJ should have included additional limitations proffered by Dr. Pollock, the consultative neuropsychologist. (Tr. 551-552). *See* Plaintiff's Brief at 4. However, the ALJ considered the opinions of Dr. Pollock in conducting his RFC assessment, and properly accorded Dr. Pollock's conclusions little weight. (Tr. 19, 544-552). As the ALJ pointed out, Dr. Pollock's assessment was based on a one-time examination, and was inconsistent with the record as a whole, especially those treatment notes indicating Parent had only mild symptoms and his condition was controlled by medication. (Tr. 19, 511, 518, 521, 525, 530, 533, 534, 545).

Additionally, the ALJ noted that Dr. Pollock's assessment was internally inconsistent, as he had opined that Parent had cognitive deficiencies and borderline intellectual functioning to a disabling degree, yet could perform complex work tasks. (Tr. 19, 552). *See, e.g., Greenspan v. Shalala*, 38 F. 3d 232, 237 (5th Cir. 1994) ("In sum, the ALJ 'is entitled to determine the credibility of medical experts as well as lay witnesses and weigh their opinions accordingly'"). Moreover, Dr. Pollock found Parent's ability to perform work-like functional tasks was "poor," yet he assessed a GAF score of 52, indicating only moderate symptoms or moderate difficulties in social, occupational, or school functioning. (Tr. 19, 550) *See Diagnostic and Statistical Manual or Mental Disorders*, 34 (4th ed.-TR2000) (*DSM-IV-TR*). Dr. Pollock also indicated that Parent was friendly and cooperative throughout the examination and exhibited fair comprehension, concentration, and attention. (Tr. 546). Such inconsistencies permit an ALJ to discredit a medical opinion. *See Greenspan*, 38 F.3d at 237 (ALJ properly considered and disregarded physician's opinion when it was contradicted by both itself and outside medical evidence).

Thus, the ALJ properly relied on Dr. Ferguson's August 18, 2008, assessment stating Parent could understand, remember, and carry out simple instructions; make simple decisions, attend and concentrate for extended periods; interact adequately with coworkers and supervisors; and respond to changes in a work setting. (Tr. 20, 455-456). The ALJ found this opinion well-supported by both the remainder of medical evidence and Parent's own testimony indicating stabilization in Parent's condition with medication. (Tr. 20, 49, 57, 511, 518, 521, 525, 530, 533, 534).

In formulating Parent's RFC assessment, the ALJ considered a variety of factors, including both Dr. Pollock and Dr. Ferguson's opinions, before properly determining that Parent's subjective complaints were not credible to the extent alleged. (Tr. 15-21). *See Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988) (ALJ considered inconsistencies between medical evidence, claimant's daily activities, and claimant's testimony before determining claimant was not credible); Social Security Ruling (SRR) 96-7p, 1996 WL 374186 at *3 (July 2, 1996). The determination of the ALJ is supported by substantial evidence. (Tr. 15-21).

The record does not support a finding of a more significant limitation. As noted by the ALJ, Arizona doctors noted Parent's ability "keep a low profile" and his ability to control his behavior if he chooses to do so. (Tr. 18, 304). Additionally, the record indicates that Parent's condition improved with the help of medication (Tr. 18, 511, 518), to the extent that his thought process was organized and goal directed and he demonstrated only mild manic symptoms, and overall mental symptoms rated a "3 out of 10 in severity." (Tr. 18, 521, 525, 530, 533, 534). Such evidence indicates that, with the help of medication, Parent could complete a normal work day and work week. (Tr. 15).

### B. Necessity of Additional Medical Evidence

Parent contends that the ALJ erred by not calling a medical expert to testify at hearing to refute Dr. Pollock's assessment. Plaintiff's Brief at 9. Parent argues that Dr. Pollock's assessment was consistent with the record as a whole, including the treatment records from Tri-County Mental Health and Mental Retardation (MHMR) Services. (Tr. 477, 486, 489, 494). *See* Plaintiff's Brief at 6-8. As noted above, the ALJ found Dr.

Pollock's opinions were internally inconsistent and therefore accorded them little weight. Parent argues that the ALJ based the decision of the case on his erroneous layman's opinion of the medical evidence, rather than the opinion of Dr. Pollock. Plaintiff's Brief 8-9.

Subjective complaints must be "corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989). The objective medical evidence—as well as the Final Treatment Considerations cited by Parent—indicate that Parent's condition improved significantly with medication. (Tr. 477, 494, 511, 518, 521, 525, 530, 533, 534). Impairments that can be reasonably remedied or controlled by medication of treatment are not disabling. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988).

Furthermore, a psychological evaluation of Parent conducted in July 2008 indicated he could complete routine chores and tasks "when he decides to," without assistance. (Tr. 437). Parent's speech was coherent and relevant; his thought process showed no evidence of circumstantiality, loose associations, or tangential thinking; he did not appear confused; he was fully oriented to person, place and time; and his memory functions were within expectation of his intellectual abilities, though he was defensive about his criminal record. (Tr. 438-439). Such evidence supports the state agency medical consultant's opinion finding largely moderate limitations, upon which the ALJ relied. (Tr. 20, 455-457).

The ALJ based his RFC assessment on the well-supported findings of the state agency medical consultant. The ALJ has the sole responsibility for deciding the extent of

Parent's disability, based on the record as a whole. *Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990). As such, it is within the ALJ's authority to interpret and weigh all of the medical evidence, including Dr. Pollock's assessment. Therefore, no additional expert testimony was needed, and the ALJ's RFC assessment is supported by the record as a whole.

## CONCLUSION

A review of the record reveals that the ALJ applied the appropriate legal standards in making this determination. Additionally, substantial evidence supports the determination that Parent was not disabled during the relevant time period. A review of the pleadings, the discovery and disclosure materials on file, and any affidavits shows that there is no genuine issue as to any material fact in this case, and summary judgment is therefore appropriate. FED. R. CIV. P. 56(c). Accordingly, Parent's Motion for Summary Judgment is **denied** and the Commissioner's Motion for Summary Judgment is **granted**.

Signed at Houston, Texas on June 22, 2011.

George C. Hanks, Jr.
United States Magistrate Judge